UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAYSON ACKERNECHT,

                              Plaintiff,

v.                                                      6:12-CV-00601
                                                        (TJM/TWD)

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL SECURITY,[1]

                              Defendant.
_____

APPEARANCES:                          OF COUNSEL:

Law Office of Stephen J. Mastaitis, Jr.    STEPHEN J. MASTAITIS, JR., ESQ.
*Counsel for Plaintiff*
1412 Route 9P
Saratoga Springs, NY 12866


HON. RICHARD S. HARTUNIAN              VERNON NORWOOD, ESQ.
United States Attorney for the         Special Assistant United States Attorney
  Northern District of New York
*Counsel for Defendant*
Room 218
James T. Foley U.S. Courthouse
Albany, New York 12207


OFFICE OF GENERAL COUNSEL              STEPHEN P. CONTE, ESQ.
Social Security Administration         Chief Counsel, Region II
26 Federal Plaza, Room 3904
New York, New York 10278

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT AND RECOMMENDATION

        This matter was referred to the undersigned for report and recommendation by the

--------------------------------------------------

        [1]        On February 14, 2013, Carolyn W. Colvin took office as Acting Commissioner of
Social Security.  She has therefore been substituted as the named Defendant in this matter
pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Honorable Thomas J. McAvoy, United States District Judge, pursuant to 28 U.S.C. § 636(b)

(2013) and Northern District of New York Local Rule 72.3(d). This case has proceeded in

accordance with General Order 18 of this Court which sets forth the procedures to be followed

when appealing a denial of Social Security benefits. Both parties have filed briefs. (Dkt. Nos. 11

and 14.) Oral argument was not heard. For the reasons discussed below, it is recommended that

the Commissioner's decision be affirmed.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff is presently 40 years old with a date of birth of June 17, 1973. (T. at 48.[2]) He

testified at a hearing on October 19, 2010, that he completed high school and took some special

education classes while in high school. *Id.* at 995, 1005. He attended Fulton Community

College but did not complete any classes. *Id.* at 1005. His past jobs included cleaner, hide

splitter at a leather factory, janitor, gas station attendant, truck driver helper, brake repairman for

an auto repair company, stock clerk at a grocery store, tune up mechanic, tire changer, fire

equipment installation worker, night watchman, telemarketer and snow removal worker. *Id.* at

998-1000, 1025-30. He testified he worked full time as a telemarketer in 2007 and 2008 until the

company "went out of business." *Id.* at 1002-04. He further testified he cannot work because of

seizures, dizziness, asthma and mental impairments including memory problems. *Id.* at 1004-10,

1013-19.

Plaintiff applied for disability insurance benefits and Supplemental Security Income

("SSI") on October 24, 2005. *Id.* at 14. The application was denied on January 31, 2006. *Id.*

---

[2]        Citations identified as "T" reference the Administrative Transcript (Dkt. Nos. 8
and 9) and the pages set forth in those documents.

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on March 27, 2006. *Id.* The hearing was held on July 15, 2008. *Id.* On September 19, 2008, the ALJ issued a decision finding that Plaintiff was not disabled. *Id.* at 14-24. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on March 26, 2009. *Id.* at 2. Plaintiff thereafter commenced an action in the United States District Court for the Northern District of New York, and the matter was remanded on consent. *Id.* at 500. Plaintiff also filed a concurrent application on October 10, 2008. *Id.* Pursuant to the remand, the Appeals Council directed that the two applications be consolidated. *Id.* Another hearing was held on October 19, 2010. *Id.* at 988. On November 24, 2010, the ALJ issued a decision finding that Plaintiff was not disabled. *Id.* at 500-10. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on February 10, 2012. *Id.* at 511. Plaintiff thereafter commenced this action on April 9, 2012. (Dkt. No. 1.)

## II.     APPLICABLE LAW

### A.     Standard for Benefits

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2013). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

3

other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* at § 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a) (2013)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability. 20 C.F.R. § 416.920 (2012). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [20 C.F.R.] §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [20 C.F.R.] §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. [20 C.F.R.] §§ 404.1520(f), 404.1560(c), 416.920(f), 416.9630(c).

*Thomas*, 540 U.S. at 24-25 (footnotes omitted).

The plaintiff-claimant bears the burden of proof regarding the first four steps. *Kohler v.*

*Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citing *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

If the plaintiff-claimant meets his or her burden of proof, the burden shifts to the defendant-

Commissioner at the fifth step to prove that the plaintiff-claimant is capable of working.  *Id.*

**B.      Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the

correct legal standards were applied and whether substantial evidence supports the decision.  42

U.S.C. § 405(g) (2012); *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011)

(citations omitted); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v.*

*Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision

if it reasonably doubts whether the proper legal standards were applied, even if the decision

appears to be supported by substantial evidence.  *Johnson*, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the

determination of whether there is substantial evidence in the record to support the decision. 42

U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "[A]n ALJ must set forth

the crucial factors justifying his findings with sufficient specificity to allow a court to determine

whether substantial evidence supports the decision."  *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248

(N.D.N.Y. 2010) (citation omitted); *see also Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir.

1984).  "Substantial evidence has been defined as such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Williams ex rel. Williams v. Bowen*, 859 F.2d

255, 258 (2d Cir. 1988) (citation and quotation omitted).  It must be "more than a mere scintilla"

of evidence scattered throughout the administrative record.  *Featherly*, 793 F. Supp. 2d at 630;

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. Nat'l Labor*

*Relations Board*, 305 U.S. 197, 229 (1938)).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258 (citations omitted).  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972); *see also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## III.   THE ALJ DECISION

The ALJ first addressed when Plaintiff last met the insured status requirements.  (T. at 501.)  An individual must demonstrate the onset of disability on or before his date last insured in order to qualify for Social Security disability benefits.  *Kohler*, 546 F.3d at 265.  Here, the ALJ determined that Plaintiff's date last insured was December 31, 2012.  (T. at 501.)  Plaintiff makes no challenge to this determination.

The ALJ then made the following findings with regard to the period from Plaintiff's alleged onset date of October 17, 2005, through his date last insured of December 31, 2012:

1.   The claimant engaged in substantial gainful activity from October 2006 through October 2007.  *Id.* at 503.

2.   The claimant has the following medically determinable severe impairments: seizure disorder, borderline intellectual functioning, adjustment disorder, anxiety disorder, and depressive disorder.  *Id.*

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals a listed impairment.  *Id.*

4.   The claimant has the residual functional capacity ("RFC") to perform a full range

of unskilled work at all exertional levels but should not be required to drive, work from heights, around dangerous equipment, or in potentially dangerous environments. *Id.* at 504.

5.      Claimant is capable of performing past relevant work as a night watchman. *Id.* at 508.

6.      Considering claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform. *Id.* at 509.

## IV.    THE PARTIES' CONTENTIONS

Plaintiff makes the following claims:

1.      The ALJ erred by failing to find Plaintiff's combined severe impairments equal a listed impairment. (Dkt. No. 11 at 6-14.[3])

2.      The ALJ's finding that Plaintiff retains the RFC to perform past relevant work and the other jobs cited is not supported by substantial evidence and is the product of legal error. *Id.* at 14-15.

3.      The Appeals Council failed to consider new and relevant post-hearing medical evidence. *Id.* at 15-16.

Defendant contends that the ALJ's decision applied the correct legal standards, is supported by substantial evidence and, thus, should be affirmed. (Dkt. No. 14.)

## V.     DISCUSSION

### A.     The Medical Evidence

Plaintiff was initially admitted to Nathan Littauer Hospital for seizure activity on October 18, 2005, and discharged the next day. (T. at 710-11.) A computerized axial tomography ("CT") scan of his brain was negative, and his physical exam was "unremarkable except for a possible up-going toe on his right foot" and "some horizontal nystigmus when staring forward." *Id.* at

---

[3]      Page numbers in citations to the parties' briefs refer to the page numbers assigned by the Court's electronic filing system.

710. He had not experienced any seizure activity in the previous 20 years. *Id.*

Eugene Kaplan, M.D., a neurologist, examined Plaintiff on October 19, 2005, in follow up for the seizure disorder. *Id.* at 125-26. Dr. Kaplan observed that Plaintiff's gait was normal and that he demonstrated full muscle strength as well as normal reflexes and sensations throughout his arms and legs. *Id.* at 126. A seizure disorder was diagnosed, and the doctor advised Plaintiff not to drive for one year from the date of his last seizure episode and to avoid working at unprotected heights or around potentially dangerous machinery or open bodies of water. *Id.*

Kerry Brand, Ph.D., a consultative psychologist, evaluated Plaintiff on December 14, 2005, and assessed that he could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, make appropriate decisions, relate adequately with others, deal appropriately with stress, and maintain a regular schedule. *Id.* at 143. Dr. Brand observed that Plaintiff may have difficulty learning new tasks and performing complex tasks independently; but, Plaintiff's speech and language skills were adequate, he was friendly and cooperative, and his attention and concentration skills were good. *Id.* at 142-43. Dr. Brand assessed Plaintiff's cognitive functioning and found Plaintiff achieved a performance scale IQ of 83, a full scale IQ of 77, and a verbal scale IQ of 76. *Id.* at 143. The doctor noted that the results of the Wechsler Adult Intelligence Scale, Third Addition ("WAIS-III"), test was a valid and reliable estimate of Plaintiff's functioning. *Id.* at 142. As to his mode of living, Plaintiff reported that he dressed, bathed, and groomed himself; cooked and prepared meals; did household cleaning; did the laundry; grocery shopped; and socialized. *Id.* at 143. He did not drive nor use public transportation. His hobbies included working as a volunteer for his local

emergency medical services and fire department. *Id.* Plaintiff spent his days at home working on his computer. *Id.* Dr. Brand opined that Plaintiff's cognitive problems should not significantly interfere with his ability to function on a daily basis. *Id.* at 144.

Terri Bruni, Ph.D., a state agency psychological consultant, reviewed the evidence of record on January 19, 2006, and assessed that Plaintiff's borderline intellectual functioning was not of Listings-level severity. *Id.* at 243, 247; *see also* 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.05. Plaintiff had a slight restriction in performing activities of daily living; slight difficulties in maintaining social functioning; often experienced deficiencies in maintaining concentration, persistence, or pace; and no episodes of deterioration. (T. at 253.) He had no significant limitations in (1) remembering locations and work-like procedures; (2) understanding, remembering, and carrying out very short and simple instructions; (3) maintaining attention and concentration for extended periods; (4) performing activities within a schedule; (5) sustaining an ordinary work routine; (6) working in coordination with or proximity to others; (7) making simple work-related decisions; (8) interacting appropriately with the general public; (9) asking simple questions or requesting assistance; (10) accepting instructions and responding appropriately to criticism from supervisors; and (11) getting along with co-workers or peers. *Id.* at 257-58. Dr. Bruni found Plaintiff had moderate limitations in (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3) completing a normal workday and workweek without interruptions from psychologically-based symptoms; (4) maintaining socially appropriate behavior; and (5) responding appropriately to changes in the work setting. *Id.*

Richard Brooks, M.D., a neurologist, examined Plaintiff on February 22, 2006, and April

6, 2006, for complaints of a seizure disorder. *Id*. at 398-401. In February 2006, Plaintiff told Dr. Brooks that he had a seizure in December 2005 after not taking his medication for three days. *Id.* at 399; *see also* T. at 129. Plaintiff stated that he was seizure-free while taking his medication. *Id*. at 399. Upon examination, Dr. Brooks observed that Plaintiff's gait was normal, that he demonstrated full muscle strength as well as normal reflexes and sensations throughout his arms and legs, and that his physical examination was essentially normal. *Id.* at 400. The doctor advised Plaintiff not to drive until he has been seizure free for six months and not to climb high off the ground or operate dangerous machinery. *Id.* at 400-01. Dr. Brooks opined that Plaintiff had no other restrictions and noted that people with epilepsy are able to function at the workplace and perform most every other job aside from the above-mentioned restrictions. *Id.* Dr. Brooks found that Plaintiff was "an otherwise healthy, able-bodied individual that should be able to find some type of gainful employment" and assessed that Plaintiff's "seizure disorder should be easily controlled." *Id.* In April 2006, Dr. Brooks noted that an electroencephalography ("EEG"), taken in March 2006, and a magnetic resonance imaging ("MRI") of Plaintiff's brain, taken in November 2005, were unremarkable. *Id.* at 398; *see also* T. at 378.

Plaintiff was hospitalized for breakthrough seizures in May 2007 and October 2007. *Id.* at 380, 388-89; *see also* T. at 375. In May 2007, Plaintiff's wife told an attending physician that Plaintiff had been drinking alcohol prior to the seizure. *Id.* at 388. Upon examination, an attending physician observed that Plaintiff's physical condition was unremarkable. *Id.* The physician advised Plaintiff to take his seizure medication and to avoid alcohol. *Id.* at 389. Plaintiff was discharged the same day in stable condition. *Id.* In October 2007, Plaintiff reported that he had recently been noncompliant with his medication. *Id.* at 380. Upon examination, an

attending physician observed that Plaintiff's physical condition was unremarkable. *Id.* A CT scan of Plaintiff's head was unremarkable. *Id.* at 375. An MRI of Plaintiff's brain, taken on June 16, 2008, was also unremarkable. *Id.* at 672. An EEG, taken on August 25, 2008, was likewise unremarkable. *Id.* at 691.

Plaintiff was seen throughout 2007 and 2008 by Paul Perreault, M.D., who treated him for the seizure disorder, depression and anxiety, and smoking cessation. *Id.* at 660-699. Plaintiff testified that he has asthma and that Dr. Perreault treated that condition. *Id.* at 1007-08. Plaintiff was also seen by Dr. Perreault in the summer of 2010 for depression, smoking cessation, asthma and/or bronchitis and sinusitis. *Id.* at 978-81.

Plaintiff underwent psychiatric therapy at the Family Counseling Center, from October 2008 through May 2010, for complaints of memory loss, depression, and anxiety following the unexplained disappearance of his wife. *Id.* at 740-46; 912-50. Plaintiff attended psychiatric therapy sessions with Ms. Kimberly Tambasco, a social worker, and obtained medication management with David Clough, M.D., a psychiatrist. *Id.* In January 2009, Dr. Clough assessed that Plaintiff could perform mild general office work that was neither stressful nor complicated. *Id.* at 932. In February 2009, Plaintiff told Dr. Clough that he was working at the Lexington Center for thirty hours per week to pay for his social services support. *Id.* at 928. Dr. Clough assessed that Plaintiff's global assessment of functioning ("GAF") score was 65.[4] *Id.* In March 2009, Dr. Clough observed that Plaintiff's depression and anxiety had significantly improved. *Id.*

---

[4]   A GAF ranging from 61 to 70 signifies some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functioning well, with some meaningful interpersonal relationships. *Diagnostic and Statistical Manual of Mental Disorders-IV-TR*, Front Matter, Multiaxial Assessment (2000 ed.).

at 926.  In October 2009, Dr. Clough noted that Plaintiff was handling his job at a call center, that he had previously handled some custodial work quite well, and that he should not be considered disabled.  *Id.* at 921.

From March 2009 through January 2010, Plaintiff attended psychiatric therapy sessions with Ms. Tambasco.  *Id.* at 933-45.  On the DSM-IV multiaxial scale,[5] Ms. Tambasco consistently assessed generalized anxiety disorder (controlled with medication) and post-traumatic stress disorder (PTSD), in partial remission, on Axis I; and GAF scores ranging from 53[6] (upon admission) to 68[7] in January 2010 on Axis V.  *Id.* at 933, 937, 940, 944.  In October 2009, Plaintiff told Ms. Tambasco that he was working part time at King Tel services call center and had been seizure free for the past seven months.  *Id.* at 937.  In January 2010, Plaintiff reported that King Tel had gone out of business, but that he was scheduled to be begin taking classes at the local community college to obtain a certificate for office work.  *Id.* at 933.

H. Ferrin, a state agency psychological consultant, reviewed the evidence of record on March 17, 2009, and assessed that Plaintiff's borderline cognitive functioning, major depressive disorder, and generalized anxiety disorder were not of Listings-level severity.  *Id.* at 768, 769,

---

[5]    The DSM-IV multiaxial scale assesses an individual's mental and physical condition on five axes, each of which refers to a different class of information. Axis I refers to clinical disorders; Axis II refers to personality disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V cites the individual's global assessment of functioning. *Diagnostic and Statistical Manual of Mental Disorders-IV-TR*, Front Matter, Multiaxial Assessment (2000 ed.).

[6]    A GAF of 51 to 60 signifies some moderate symptoms (e.g., flat affect and circumstantial speech occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Diagnostic and Statistical Manual of Mental Disorders-IV-TR*, Front Matter, Multiaxial Assessment (2000 ed.).

[7]    *See supra* note 4.

771, 773; *see also* 20 C.F.R. pt. 404, subpt. P, app. 1, Listings 12.02, 12.04, 12.06. Plaintiff had

a mild restriction in performing the activities of daily living; mild difficulties in maintaining

social functioning; moderate deficiencies in maintaining concentration, persistence, or pace; and

no episodes of deterioration. *Id.* at 778. Plaintiff had no limitations in (1) remembering locations

and work-like procedures; (2) understanding, remembering, and carrying out very short and

simple instructions; (3) interacting appropriately with the general public; (4) accepting

instructions and responding appropriately to criticism from supervisors; (5) getting along with co-

workers or peers; and (6) maintaining socially appropriate behavior. *Id.* at 764-765. Plaintiff had

no significant limitations in (1) maintaining attention and concentration for extended periods; (2)

performing activities within a schedule; (3) sustaining an ordinary work routine without special

supervision; (4) working in coordination with or proximity to others; (5) making simple work-

related decisions; (6) asking simple questions or requesting assistance; and (7) responding

appropriately to changes in the work setting. *Id.* He had moderate limitations in completing a

normal workday or workweek without interruptions from psychologically-based symptoms and in

carrying out detailed instructions. *Id.* at 765.

On January 27, 2009, and April 22, 2009, Plaintiff was evaluated by licensed psychologist

Anne L. Barba, Ph.D. *Id.* at 802-08. Dr. Barba assessed Plaintiff's cognitive functioning with

measures from the WAIS-IV and found Plaintiff achieved a full scale IQ of 69 (very low range).

*Id*. at 806. He scored a Processing Speed Index of 81 (low average range), a Perceptual

Reasoning Index of 75 (borderline range), a Working Memory Index of 71 (borderline range),

and a Verbal Comprehension Index of 68 (very low range). *Id.* She concluded that "[g]iven that

current cognitive test data revealed considerable impairments in most of the realms assessed, it is

my opinion that the patient is disabled and so unable to work at a competitive level." *Id.* at 808.

In March of 2009, consultative psychiatric and intelligence exams were preformed on Plaintiff by Annette Payne, Ph.D. *Id.* at 752-61. Based upon the testing, she found Plaintiff had a verbal scale IQ of 75, a performance scale IQ of 83, and a full scale IQ of 76, and placed him in the borderline range of intelligence. *Id.* at 759. She also found Plaintiff had a cognitive disorder (seizures), mild to moderate major depression, and generalized anxiety disorder. *Id.* at 755. She reported that Plaintiff could follow and understand simple directions and instructions and that he could perform simple tasks. *Id.* at 755, 760. While he had problems with attention and concentration as well as difficulties with new tasks, complex tasks and making decisions, she indicated he may benefit from vocational rehabilitation. *Id.* at 755. She also noted his activities of daily living were very functional because he maintained his own self care, did his laundry, shopped, drove a car, volunteered as a firefighter and tried to keep busy. *Id.* at 754-55, 760.

Timothy Lynch, M.D., a neurologist, evaluated Plaintiff on May 6, 2010, for complaints of a seizure disorder. *Id.* at 884-85. Plaintiff reported that he had been seizure-free from March 25, 2009, until January 2010, when he had a breakthrough seizure. *Id.* at 884. That seizure was associated with a change from his brand name seizure medication, Topamax, to a generic version. *Id.* Dr. Lynch noted that Plaintiff was doing quite well with no complaints and was seizure free since returning to brand name Topamax. *Id.* Upon examination, Dr. Lynch observed that Plaintiff's gait and station were normal, that he demonstrated full muscle strength, and that his reflexes and sensations throughout his arms and legs were normal. *Id.* at 884 -85. Dr. Lynch assessed that Plaintiff's seizures were "well-controlled by his current medication regimen." *Id.* at 885.

14

Plaintiff was hospitalized for a breakthrough seizure on May 11, 2010. *Id.* at 896-98, 985-86. Plaintiff told Gabor Zoltsay, M.D., the attending physician, that he had only one or two seizures per year when he is compliant with his medication. *Id.* at 896. Upon examination, Plaintiff's physical condition was unremarkable. *Id.* at 897. A screen of Plaintiff's urine was positive for benxodiazepine and alcohol. *Id.* at 985. Dr. Zoltsay assessed that Plaintiff's seizure was probably triggered by alcohol. *Id.* at 897.

Plaintiff underwent epilepsy testing in July 2010 which confirmed the existence of localization related epilepsy. *Id.* at 977. Based upon further testing in August of 2010, Anthony Rittaccio, M.D., a neurologist, noted that Plaintiff would be an appropriate candidate for left temporal lobe epilepsy surgery. *Id.* at 967. The diagnostic cerebral angiogram performed in August of 2010 was normal. *Id.* at 961. In a follow up exam by John Dalfino, M.D., a neurologist, Plaintiff's physical exam was normal. *Id.* at 952.

## B. Plaintiff's Combined Severe Impairments

Plaintiff initially argues the ALJ erred by failing to find Plaintiff's combined severe impairments equal a listed impairment. (Dkt. No. 11 at 6-14.) The listed impairment upon which Plaintiff relies is 20 C.F.R. pt. 404, subpt. P, app. 1, §12.05C, which presumes a disability under mental retardation and states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

*** 

15

A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. pt. 404, subpt. P, app. 1, §§12.05, 12.05C.

A claimant is automatically entitled to benefits if his or her impairment(s) meets criteria set forth in "the Listings." 20 C.F.R. § 404.1520(d). The burden is on the claimant to present medical findings that show that his or her impairments match a listing or are equal in severity to a listed impairment. *Zwick v. Apfel*, No. 97 Civ. 5140, 1998 WL 426800, at *6, 1998 U.S. Dist. LEXIS 11515, at *19 (S.D.N.Y. July 27, 1998) (J. Koeltl). In order to show that an impairment matches a listing, the claimant must show that his or her impairment meets all of the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); 20 C.F.R. § 404.1525(d). If a claimant's impairment "manifests only some of those criteria, no matter how severely," the impairment does not qualify. *Sullivan*, 493 U.S. at 530.

However, in cases in which the disability claim is premised upon one or more listed impairments of Appendix 1, "the Secretary should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982). While a court may be able "to look to other portions of the ALJ's decision" and to "credible evidence in finding that his determination was supported by substantial evidence," the Second Circuit has noted that "[c]ases may arise, however, in which we would be unable to fathom the ALJ's rationale in relation to evidence in the record . . . . In such instances, we would not hesitate to remand the case for further findings or a clearer explanation for the decision." *Id.* (citations omitted). Thus, while an ALJ is not obligated to address specifically each piece of evidence in his decision, *Jones v. Barnhart*, No. CV-04-2772, 2004 WL 3158536, at *6, 2005

U.S. Dist. LEXIS 1724, at *15 (E.D.N.Y. Feb. 3, 2005[8]) (Block, J.), he is not excused "from

addressing an issue central to the disposition of the claim." *Ramos v. Barnhart*, No. 02 Civ.

3127, 2003 WL 21032012, at *10, 2003 U.S. Dist. LEXIS 7463, at *29 (S.D.N.Y. May 6, 2003)

(M.J. Gorenstein) (citing, *inter alia*, *Ferraris v. Hecker*, 728 F.2d at 587) ("We of course do not

suggest that every conflict in a record be reconciled by the ALJ or the Secretary . . . but we do

believe that the crucial factors in any determination must be set forth with sufficient specificity to

enable us to decide whether the determination is supported by substantial evidence.") (internal

citation omitted)).

Here, I find the ALJ's determination that Plaintiff's alleged disability did not meet a listed

impairment, and specifically Listing 12.05C, is fully supported by substantial evidence in the

record and not the product of legal error.  Plaintiff points to the opinion of Dr. Barba who found

his full scale IQ was 69 in April of 2009.  (Dkt. No. 11 at 7; *see also* T. at 806.)  Plaintiff also

argues the ALJ did not discuss a test report on 12/7/78 which showed a full scale IQ of 69.  (Dkt.

No. 11 at 8; *see also* T. at 616.)  However, the ALJ noted that the record contains evidence of full

scale IQ scores of 77 and 76 in December of 2005 and March of 2009.  (T. at 143, 503, 759.)

The record also contains evidence of full scale IQ scores of 86 on 9/21/81; 86 on 3/8/83; and 85

on 2/6/86.  *Id.* at 616, 620.

Moreover, the Court has looked to other portions of the ALJ's decision and is able to

conclude that his step three finding was supported by substantial evidence.  *See Berry*, 675 F.2d

at 469 (finding that a court may be able "to look to other portions of the ALJ's decision . . . in

---

[8]

      LEXIS and Westlaw list different years for this decision.  I have used the date listed
by Westlaw.

finding that his determination was supported by substantial evidence "). The ALJ declined to give significant weight to the opinion of Dr. Barba, who found the full scale IQ of 69, but was not a treating medical source and examined Plaintiff on only one occasion. (T. at 506.) The ALJ fully explained that Dr. Babra's opinion that the Plaintiff was disabled contradicted the medical evidence in the record as a whole. *Id.* at 506-07.

For example, in January 2009, treating psychiatrist Dr. Clough assessed that Plaintiff could perform mild general office work that was neither stressful nor complicated. *Id.* at 932. In February 2009, Plaintiff told Dr. Clough that he was working at the Lexington Center for thirty hours per week to pay for his social services support. *Id.* at 928. In October 2009, Dr. Clough noted that Plaintiff was handling his job at a call center, that he had previously handled some custodial work quite well, and that he should not be considered disabled. *Id.* at 921. Plaintiff testified the janitor work ended in 2008, but he was collecting unemployment for two years prior to the October 19, 2010, hearing. *Id.* at 993.

Treating neurologist Dr. Brooks, in February of 2006, found Plaintiff seizure-free while taking his medication. *Id*. at 399. Plaintiff's physical exams were generally normal. *Id.* at 400. Plaintiff was advised not to drive until he was seizure free for six months and not to climb high off the ground or operate dangerous machinery. *Id.* at 400-01. Dr. Brooks opined that Plaintiff had no other restrictions, and noted that people with epilepsy are able to function at the workplace and perform most every other job aside from the above-mentioned restrictions. *Id.* Dr. Brooks found that Plaintiff was an otherwise healthy, able-bodied individual that should be able to find some type of gainful employment and assessed that Plaintiff's seizure disorder should be easily controlled. *Id.* In April 2006, Dr. Brooks noted that an EEG, taken in March 2006, and

an MRI of Plaintiff's brain, taken in November 2005, were unremarkable. *Id.* at 398; *see also* T. at 378.

Similarly, Dr. Kaplan, a treating neurologist, instructed that Plaintiff's only work-related limitations were that he should avoid driving, as well as avoid working at unprotected heights, or around potentially dangerous machinery and open bodies of water. *Id.* at 126.

Dr. Lynch, a treating neurologist, evaluated Plaintiff on May 6, 2010, for complaints of a seizure disorder. *Id.* at 884-85. Plaintiff reported that he had been seizure-free from March 25, 2009, until January 2010, when he had a breakthrough seizure. *Id.* at 884. That seizure was associated with a change from his brand name seizure medication, Topamax, to a generic version. *Id.* Dr. Lynch noted that Plaintiff was doing quite well with no complaints and was seizure free since returning to Topamax. *Id.* Plaintiff's physical exam was normal. *Id.* at 884-85. Dr. Lynch assessed that Plaintiff's seizures were well-controlled by his current medication regimen. *Id.* at 885.

Further, Plaintiff has failed to demonstrate significantly sub-average general intellectual functioning with deficits in adaptive functioning. For instance, Plaintiff testified that he was a high school graduate with college experience. *Id.* at 62, 839, 853-72, 1005. He completed vocational training in auto mechanics. *Id.* In this regard, Dr. Brand, a consultative psychologist, assessed that Plaintiff could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, make appropriate decisions, relate adequately with others, deal appropriately with stress, and maintain a regular schedule. *Id.* at 143. Dr. Brand opined that Plaintiff's cognitive problems should not significantly interfere with his ability to function on a daily basis. *Id.* at 144.

Additionally, Plaintiff acknowledged that he could follow written instructions and had no problems getting along with bosses or others in authority. *Id.* at 70. Moreover, Plaintiff has a long work history which includes employment as an auto mechanic, a telemarketer, a night watchman, a gas station manager, and a janitor as well as a job selling and servicing fire extinguishers. *Id.* at 441-53, 589-96, 1002-04. Plaintiff also acknowledged extensive experience as a volunteer firefighter in which he went out on about 75 calls per year. *Id.* at 441, 459-60.

In short, Plaintiff failed to demonstrate that his impairments satisfied the severity criteria for Listing 12.05C. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.05C. Thus, I find the ALJ's determination that Plaintiff's impairments were not of Listings-level severity is supported by substantial evidence and not the product of legal error.

**C.    Plaintiff's Residual Functional Capacity to Perform Past Relevant Work and the Jobs Cited by the Vocational Expert**

**1.    Determination of Plaintiff's Residual Functional Capacity**

Plaintiff claims the ALJ erred in determining that he retains the RFC to perform his past relevant work as a night watchman and other jobs cited by the vocational expert because his memory is impaired and certain jobs cited might require him to climb ladders or stairs and expose him to asthma-triggering environments. (Dkt. No. 11 at 14-15.) At the heart of Plaintiff's argument is that the RFC finding of the ALJ is inconsistent with the limitations imposed by his physical seizure condition and his mental condition. The Commissioner argues that the ALJ's RFC finding is properly supported in the record. (Dkt. No. 14 at 19-22.) The Court agrees with the Commissioner.

A claimant's RFC represents a finding of the range of tasks he or she is capable of performing despite his or her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomatology, including pain, and other limitations that could interfere with work activities on a regular and continuing basis. *Id.; Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999).

To properly ascertain a claimant's RFC, an ALJ must assess a claimant's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. §§ 404.1545(a), 404.1569(a). Non-exertional limitations or impairments, including impairments that result in postural and manipulative limitations, must also be considered. 20 C.F.R. §§ 404.1545(b), 404.1569(a); *see also* 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(e). When making an RFC determination, an ALJ must specify those functions that the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice. *Martone*, 70 F. Supp. 2d at 150 (citation omitted). Further, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations. *Martone*, 70 F. Supp. 2d at 150 (citation omitted).

Regarding the exertional portion of the ALJ's determination of Plaintiff's RFC, Plaintiff did not allege, nor did the evidence of record demonstrate, any physical exertional limitations due to an impairment. *See, e.g.,* T. at 56-57, 453 (Plaintiff's physical claims relate only to his seizure

condition).  As noted above, Plaintiff's treating sources consistently observed that his gait was normal and that he demonstrated full muscle strength throughout his arms and legs.  *Id*. at 126, 380, 400, 884-85, 897.  Plaintiff bases his disability claim on the fact that despite "looking all over for jobs, . . ." no one wanted to hire him due to his seizure disorder.  *Id.* at 453.

"Where no issue with respect to specific physical capacities . . . is raised by the allegations of the individual or the evidence obtained, the individual is considered to have no restrictions with respect to those capacities.  The individual has the burden of proving that he is disabled and of raising any issue bearing on that determination or decision."  SSR 86-8, 1986 WL 63636, at *6 (1986).

The ALJ's determination that Plaintiff could perform unskilled work but should not be required to drive, work from heights, around dangerous equipment, or in other potentially dangerous environments is sufficiently explained and supported in the record.   (T. at 504-06.)  The opinions and findings of Drs. Brooks, Clough, and Brand, and Ms. Tambasco as well as Dr. Bruri and Dr. Ferrin support the ALJ's RFC determination.  Dr. Brooks advised Plaintiff not to climb high off the ground or operate dangerous machinery.  *Id.* at 400-01.  He found that Plaintiff had no other restrictions.  *Id.* at 401.  Dr. Brooks noted that "[p]eople with epilepsy are able to function at the workplace and perform most every other job," aside from the above-mentioned restrictions.  *Id.*  He stated that he "rarely would place a person on disability for a seizure disorder."  *Id.*  He opined that Plaintiff was "an otherwise healthy, able-bodied individual that should be able to find some type of gainful employment" and that Plaintiff's seizure disorder "should be easily controlled."  *Id.*

As for Plaintiff's mental limitations, Dr. Clough opined that Plaintiff could perform mild

general office work that was neither stressful nor complicated and that he should not be considered disabled. *Id.* at 921, 932. Dr. Brand found that Plaintiff could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, make appropriate decisions, relate adequately with others, deal appropriately with stress and maintain a regular schedule. *Id.* at 143. She opined that Plaintiff's cognitive problems should not significantly interfere with his ability to function on a daily basis. *Id.* at 144. Ms. Tambasco, Plaintiff's therapist, assessed that his GAF scores ranged from 53 in March 2009 to 68 in January 2010, signifying, at most, moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* at 933, 937, 940, 944; *see also Diagnostic and Statistical Manual of Mental Disorders-IV-TR*, Front Matter, Multiaxial Assessment (2000 ed.).

The basic mental demands of competitive work include the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, co-workers, and usual work situations; and deal with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 404.1545(c), 416.921(b), 416.945(c); *see also* SSRs 85-15, 96-9p. In this regard, Dr. Bruri opined that Plaintiff had no significant limitations in understanding, carrying out, and remembering simple instructions; and no significant limitations in responding appropriately to supervision, co-workers, and usual work situations. (T. at 257-58.) Plaintiff had only moderate limitations in responding appropriately to changes in the work setting. *Id.* at 258. Similarly, state psychologist Ferrin found no limitations in understanding, carrying out, and remembering simple instructions; and no limitations in responding appropriately to supervision, co-workers, and usual work situations; and, only moderate limitations in maintaining attention and concentration for extended periods; and responding appropriately to changes in the work setting. *Id.* at 764-66.

State agency psychological consultants are qualified experts in the field of Social Security disability, and an ALJ is entitled to rely upon their opinions in issuing decisions. 20 C.F.R. §§ 404.1512(b)(6), 416.912(b)(6). All in all, the record is consistent with the ALJ's determined RFC, so I find it is supported by substantial evidence and the correct legal standards were applied by the ALJ.

### 2.    Plaintiff's Past Relevant Work

At step four of the sequential evaluation, the ALJ found that Plaintiff was capable of performing his past relevant work as a night watchman. (T. at 508.) Plaintiff essentially argues that the ALJ did not properly find that Plaintiff could perform his past relevant work given his impaired memory. (Dkt. No. 11 at 14-15.) The Commissioner argues that Plaintiff's work as a night watchman was properly considered past relevant work, and the ALJ properly found he could perform the requirements of that job. (Dkt. No. 14 at 24-27.) Again, the Court agrees with the Commissioner.

Plaintiff stated he worked as a night watchman from 2000 to 2002. (T. at 1029.) At step four in the analysis, the ALJ must consider whether the plaintiff has the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). In order to survive step four, "the claimant has the burden to show an inability to return to his previous specific job *and* an inability to perform his past relevant work generally. This inquiry requires separate evaluations of the previous specific job and the job as it is generally performed." *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (citations omitted, emphasis in original). Here, the ALJ found that Plaintiff could perform his past relevant work as a night watchman based upon the testimony of the vocational expert who opined Plaintiff could perform the job as a night watchman (in

addition to his past work as a cleaner and telemarketer) as it is performed or was performed in the national economy. (T. at 508, 1030.) Therefore, the ALJ's finding that Plaintiff could do the work as performed in the national economy is reasonable and based upon substantial evidence in the record.

Because the ALJ's finding that Plaintiff could perform this past relevant work as a night watchman as generally performed is sufficient to negate a finding of disability at step four, it is not necessary for the Court to determine whether Plaintiff could perform his past relevant work as actually performed. *See Jasinski,* 341 F.3d at 185; *Jock v. Harris,* 651 F.2d 133, 135 (2d Cir. 1981); *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

### 3. Other Jobs in the National Economy

I find the ALJ properly determined that Plaintiff was not disabled since he retained the RFC to perform work which existed in significant numbers in the national economy. (T. at 508-09; *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g)). The ALJ's determination was correctly based on Plaintiff's vocational factors and RFC as well as the vocational expert's testimony. (T. at 508-09, 1030-32; *see also* 20 C.F.R. §§ 404.1520(g), 404.1560(c), 404.1563-65, 404.1566(e), 416.920(g), 416.960, 416.963-65, 416.966(e).)

As noted above, the ALJ correctly determined that Plaintiff retained the RFC to perform the full range of unskilled work at all exertional levels but should not be required to drive, work from heights, around dangerous equipment, or in other potentially dangerous environments. *Id.* at 504. Plaintiff is a high school graduate and was a younger individual age on his alleged onset of disability date. *Id.* at 48, 62, 1005; *see also* 20 C.F.R. §§ 404.1563-64, 416.963-64.

The transferability of job skills was immaterial to the determination of disability since

Grid Rule 204.00, the applicable Grid Rule in this matter, directs a finding of "not disabled"

regardless of the transferability of job skills. (T. at 508-09; *see also* 20 C.F.R pt. 404, subpt. P,

app. 2, § 204.00.0  Whenever a claimant cannot perform the full range of work due to his

nonexertional impairments and such impairments do not significantly diminish his occupational

base, then the ALJ may use the Grids as a framework for decision-making.  20 C.F.R. §§

404.1569a(d), 416.969a(d); pt. 404, subpt. P, app. 2, § 200.00(e); *see also Bapp v.Bowen*, 802

F.2d 601, 603 (2d Cir. 1986) (finding the mere existence of a nonexertional impairment does not

preclude reliance on the Grids).  Moreover, when a claimant has solely non-exertional

limitations, Grid Rule 204.00 provides a framework for decision-making.  20 C.F.R. pt. 404,

subpt. P, app. 2, § 204.00.  Accordingly, the ALJ then considered whether Plaintiff's

nonexertional impairments significantly eroded his occupational base.  (T. at 509.)

Plaintiff argues that his past job of gas station attendant would require him to climb

ladders and that, therefore, it was inappropriate given his functional limitations.  (Dkt. No. 11 at

15.)  However, the vocational expert, Esperanza DiStefano, opined that Plaintiff could perform

several occupations other than gas station attendant which existed in significant numbers in the

national economy.  (T. at 1030-32; *see also Heckler v. Campbell*, 461 U.S. 458, 461 (1983)

(noting that the Commissioner may establish the existence of other work in the national economy

that a claimant can perform through either the medical-vocational guidelines or through the

testimony of a vocational expert)).  The vocational expert cited new accounts clerk (81,650 jobs

nationally, 7,830 jobs in New York state), order clerk (227,190 jobs nationally, 8,800 jobs in

New York state), bench assembler (433,370 jobs nationally, 16,590 job in New York state), and

ticket taker (104,360 jobs nationally, 8,820 jobs in New York state) as examples of such occupations. (T. at 1030-32.) Thus, application of Grid Rule 204.00 as a framework for decision-making was appropriate since Plaintiff's occupational base was not significantly eroded by his impairments. *Id.* at 509.

Therefore, I find that the ALJ properly determined that Plaintiff was not disabled since based on his vocational factors and RFC as well as the vocational expert's testimony, he retained the RFC to perform his past relevant work as well as other work which existed in significant numbers in the national economy. *Id.* at 508-09; 20 C.F.R. § 404.1520(g), 404.1566(e), 416.920(g), 416.966(e).

### D. Plaintiff's Post-Hearing Medical Evidence

Plaintiff next contends that he submitted "[n]ew and relevant medical records evidencing post-hearing surgery consisting of *Craniotomy with Removal of Subdural Grids and Right and Left Temporal Lobectomies* performed on 1/11/11." (Dkt. No. 11 at 15, italics in original.) Plaintiff indicates that these records were submitted in April and June of 2011 and that the records also show ongoing mental health problems and one post-lobectomy seizure. *Id.* at 15-16. Plaintiff argues that the Appeals Council erred in failing to acknowledge and/or consider this medical evidence which he generally states shows "a long-standing *markedly* limiting mental and seizure condition" and that, therefore, the ALJ's determination of Plaintiff's level of functioning is not based on substantial evidence. *Id.* at 16 (emphasis in original).

In response, the Commissioner contends that there is no record of receiving these "new and relevant" medical records. (Dkt. No. 14 at 25.) Indeed, a review of the traditionally filed administrative record/transcript (Dkt. Nos. 8 and 9) shows the records are not contained therein.

Moreover, a review of the Court's ECF Docket in this matter shows that Plaintiff filed a letter motion on November 26, 2012, requesting to submit additional documents in support of his brief on appeal. (Dkt. No. 12.) On November 27, 2012, District Court Judge McAvoy granted Plaintiff's request to submit further documents in support of his appeal and directed that the documents be submitted "immediately." (Dkt. No. 13.) To date, no such documents have been filed by Plaintiff.

New evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for purposes of judicial review when the Council denies review. *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996). In deciding whether to remand a case, the court may consider new evidence if it is material, as long as "the claimant demonstrates good cause for failing to present the evidence earlier." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 119 n.1 (2d Cir. 1998) (citing *Lisa v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 42-43 (2d Cir. 1991)); *see also* 42 U.S.C. § 405(g). Material evidence is "relevant to the claimant's condition during the time period for which benefits were denied." *Lisa,* 940 F.2d at 43. This includes test results conducted after the SSA concluded its review that provided an explanation for claimant's health problems in the time period for which benefits were denied. *Clark,* 143 F.3d at 119 n.1 (citations omitted).

The Second Circuit Court of Appeals has established a three-pronged test:

[A]n appellant must show that the proffered evidence is (1) " 'new' and not merely cumulative of what is already in the record," *Szubak v. Secretary of Health & Human Servs.,* 745 F.2d 831, 833 (3d Cir. 1984), and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. *See Cutler v. Weinberger,* 516 F.2d 1282, 1285 (2d Cir. 1975). The concept of materiality requires, in addition, a reasonable possibility that the new

> evidence would have influenced the Secretary to decide claimant's application differently.  *See Szubak,* 745 F.2d at 833; *Chaney v. Schweiker,* 659 F.2d 676, 679 (5th Cir. 1981).  Finally, claimant must show (3) good cause for her failure to present the evidence earlier.  *See Tolany v. Heckler,* 756 F.2d 268, 272 (2d Cir. 1985) (good cause shown where new diagnosis was based on recent neurological evaluation and assessment of response to medication required observation period).

*Tirado v. Bowen,* 842 F.2d 595, 597 (2d Cir. 1988).

Here, there is no evidence that these "new and relevant" medical records were ever submitted by Plaintiff apart from his statement in his brief.  Presumably, these were the documents Plaintiff requested to submit in further support of his brief, and was granted permission to do so, yet never filed.  *See* Dkt. Nos. 12 and 13.  Plaintiff states that the records consist of a post-hearing hospital admission for a craniotomy surgery and further mental health counseling.  (Dkt. No. 11 at 15-16.)  Without the records, the court has no way of assessing their materiality and whether the new evidence would have influenced the ALJ's decision.  Moreover, Plaintiff has made no showing that the records prove any change in his RFC or his ability to perform past relevant work or the work identified by the vocational expert as work he was capable of performing.  Plaintiff's conclusory statement that the records prove "persistent and increasing symptoms of depression" and "one post-lobotomy seizure" is insufficient to show that the records are new and not merely cumulative, and are material, that is relevant and probative; and there has been no showing of good cause for failing to present the evidence sooner.  *Tirado*, 842 F.2d at 597.  As such, Plaintiff has not shown any error in the Appeals Council's failure to consider these records.

**WHEREFORE,** it is hereby

**RECOMMENDED**, that the Commissioner's decision be affirmed and Defendant's

motion for judgment on the pleadings be **GRANTED** and the complaint (Dkt. No. 1) be

**DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report. Such objections shall be filed with the Clerk of the

Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL</u>**

**<u>PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85, 87 (2d Cir. 1993)

(citing *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); FED. R. CIV. P. 72.


Dated: September 13, 2013
       Syracuse, New York


                                                        Therèse Wiley Dancks
                                                        United States Magistrate Judge